Vicente MONTELONGO, Appellant,

v.

The STATE of Texas, Appellee.

No. 58846.

Court of Criminal Appeals of Texas,
Panel No. 3.

Feb. 27, 1980.

Rehearing Denied Feb. 16, 1983.

James Folsom, Corpus Christi, on appeal only, for appellant.

William B. Mobley, Jr., Dist. Atty., Eric G. Brown and Michael G. Morris, Asst. Dist. Attys., Corpus Christi, Robert Huttash, State's Atty., and Alfred Walker, Asst. State's Atty., Austin, for the State.

Before PHILLIPS, TOM G. DAVIS and DALY, JJ.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for murder. The punishment is imprisonment for life.

Appellant contends that the trial court erred in admitting in evidence a tape recording of a telephone conversation between appellant and a police dispatcher, the handle of a fishing rod seized during a warrantless search of his apartment, a statement which was the fruit of the allegedly unlawful search, and enlarged photographs of the murder victim. Appellant also contends that his requested charges on the lesser offenses of involuntary manslaughter and criminally negligent homicide were erroneously refused and the prosecutor engaged in improper jury argument.

Appellant was convicted of the murder of his four-year-old daughter, Christine Montelongo. The evidence, which includes appellant's written confession, establishes that appellant beat his daughter with his hands, belts, and a fishing rod over a five-day period culminating in her death on May 17, 1977. The medical examiner testified that the deceased "had so many bruises and so extensive and of such magnitude that the child bled to death into her bruises."

At 2:58 p.m. on May 17, appellant called the Corpus Christi Police Department to report the death of his daughter. This telephone call, during which appellant informed the dispatcher that he "just killed

somebody" and that he "beat her," was recorded by an automatic taping system which records all incoming calls to the police emergency center. The recording and a written transcript were admitted in evidence over appellant's objection that neither party to the call had consented to the recording. He renews this contention on appeal.

Linda Guerrero was the dispatcher who took appellant's call. She testified that she knew that all emergency telephone calls received by the police were recorded automatically and that she had no objection to the recording of the emergency calls she answered. When asked by defense counsel if she had consented to the recording she replied that she had, although she later conceded that she had never expressly consented in any formal way. We hold that Guerrero's testimony establishes her consent to the recording of the conversation in question. We also note that the State laid the necessary predicate for the admission of the tape recording through the testimony of Guerrero and W.J. Smith of the Technical Services Division of the Corpus Christi Police Department. See *Edwards v. State,* 551 S.W.2d 731 (Tex.Cr.App.1977). This ground of error is overruled.

Officer L.R. Williams was the first officer to arrive at the Montelongo apartment. Appellant admitted Williams and immediately took him to a bedroom where the body of the deceased was lying on the floor. On the way to and from the bedroom, Williams passed the open door of the bathroom. Williams could see inside the bathroom a sheet which someone had apparently been washing in the bathtub. Later, during a general search of the apartment after other officers had arrived, Williams entered the bathroom to examine this sheet and discovered the handle portion of a broken fishing rod lying by the lavatory. This handle was seized by the police and admitted in evidence at the trial. Appellant contends that the admission of the handle in evidence was error because the search of the bathroom was unlawful.

■ At the time he entered the bathroom, Williams had neither a warrant nor the consent of appellant or his wife to search the apartment. However, in searching the apartment a short time after discovering an apparent homicide, Williams was acting pursuant to the emergency or exigency rule applicable to homicide scene investigation. *Corbett v. State,* 493 S.W.2d 940 (Tex.Cr.App.1973); *Tocher v. State,* 501 S.W.2d 921 (Tex.Cr.App.1973); *Brown v. State,* 475 S.W.2d 938 (Tex.Cr.App.1971). This rule was abolished by the United States Supreme Court in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), which this Court has held is not retroactive. *Pearson v. State,* 587 S.W.2d 393 (Tex.Cr.App.1979). Because both the search and the trial took place before the decision in *Mincey,* when *Brown* was still the law, the trial court did not err in admitting the handle of the fishing rod. *Pearson v. State,* supra.

■ Following his arrest, appellant was taken to the police station where he executed a written confession. Omitting the formal parts, this confession reads as follows:

"My name is Vicente Montelongo and I am 26 years old. My date of birth is July 19, 1950. I am employed at Memorial Medical Center and I live at 3916 Apt. A Holly Road. I've been married to my wife, Rose, for about one and a half years. I have two daughter (sic) by a previous marriage. Their names are Christine Montelongo, age 4, d.o.b. 12–19–72, and Sandra Montelongo, age 5, d.o.b. 7–28–71. I also have another daughter by my present marriage, her name is Priscilla Montelongo, age 1, d.o.b. 4–10–76. For the past five days, have been having problems with my daughter, Christine. She did not obey me nor my wife, Rose. Every time I told her to do something, she would just look at me and fall down on the floor. This irritated me very much and I began to spank her. Friday, May 13, 1977, after I got home from work, my wife, Rose, told me that she had misbehaved and I spanked her

with my belt. I kept spanking her with all my might until I got tired. She started bleeding from her buttocks as a result of the spanking. On May 14, 1977, I was off and I spanked Christine sometime in the morning for misbehaving. She acted up again in the afternoon and I spanked her again. I used my belt on her and just kept on hitting her. On May 15, 1977, I spanked Christine again for not obeying me. This time, I used a fishing rod. I kept on hitting her in the buttocks and guess she got her arm in the way and I cut her while hitting her. Scabs had started to build on her buttocks and every time I spanked her, she would bleed. On May 16, 1977, I spanked my daughter, Christine again for disobeying me. I kept hitting her until I got two blisters on my right hand. Today, May 17, 1977, I woke up and found that Christine had peed on her bed. I took her to the bathroom and sat her down. She was bleeding from her buttocks. I then moved the mattresses outside to air out. She then got through and I put some hydrogen peroxide on her wounds so that they would heal. I kept her naked so the wounds would air out and dry up. She then went into the living room and I spanked her again because she wouldn't eat her breakfast. During the day, she walked around the house very slowly. This afternoon, I took the other kids to the store and I bought Christine some ice cream. She started eating the paper. I took the paper away from her and she fell down acting silly. This irritated me and I took my belt and spanked her from 8 to 10 times again. I then put her in her bedroom on the floor and she wet again. I picked her up and found that she was very limp. I laid her down again and saw that she was not breathing. I breathed in her mouth and massaged her heart a couple of times; however, it didn't do any good. I then called the police and told them to send a car because I had just killed my four year old daughter. This statement is true and correct to the best of my knowledge and no threats nor promises were made to me by Sgt. U.B.

Alvarado when I voluntarily gave him this statement. End."

The fishing rod handle previously discussed was on the table in the interrogation room where the confession was taken, and appellant contends that this rendered the confession inadmissible as the fruit of an unlawful search. This contention is without merit because the seizure of the handle was not unlawful. The record amply supports the finding of the trial court that appellant's confession was knowingly and voluntarily given.

Several photographs of the body of the deceased were admitted in evidence. Two of the photographs, State's Exhibits 11 and 12, were enlarged prints measuring 15 inches by 20 inches. Appellant contends that these two exhibits should not have been admitted because of their size.

■ If a photograph is competent, material, and relevant to the issues, the photograph will not be inadmissible because it is gruesome unless it is offered solely to inflame the minds of the jury. If a verbal description of the body and the scene is admissible, a photograph depicting the same is admissible. Only when the probative value of the photographs is very slight and the inflammatory aspects great will it be an abuse of discretion to admit the photographs. *Harrington v. State,* 547 S.W.2d 621 (Tex.Cr.App.1977); *Martin v. State,* 475 S.W.2d 265 (Tex.Cr.App.1972).

■ The photographs in question were relevant to the jury's determination of the cause of death and of appellant's intent when he inflicted the beatings. Appellant does not contend that the photographs were inaccurate in any way. We hold that the size of the photographs does not so exaggerate their inflammatory aspects as to render their admission in evidence an abuse of discretion.

■ Appellant contends that the inflammatory nature of the enlarged photographs was increased by having the two exhibits on constant display during the trial. However, the record does not support this contention. On at least two occasions, appellant object-

ed to the display of Exhibits 11 and 12 when they were not the subject of testimony. On both occasions, the trial court sustained the objection and ordered that the photographs be put away. If at other times these photographs remained on display after testimony concerning them was concluded, the failure of appellant to object leaves nothing for review.

■ Appellant contends that the trial court erred by refusing his requested charges on involuntary manslaughter and negligent homicide. He argues that an issue as to his guilt of these lesser offenses was raised by the testimony of Dr. Joel Kutnick, a psychiatrist who examined appellant after his arrest. Dr. Kutnick testified that he believed that appellant was trying to discipline his daughter when he beat her. Appellant also points to those passages in his confession in which he described his efforts to treat the child's wounds and to revive her after she died.

While appellant's disciplinary motive for beating his child and his efforts to treat her wounds may be circumstances reflecting on his mental state at the time he beat her, they are not inconsistent with a finding that appellant intentionally or knowingly caused the child's death as alleged in the indictment. See V.T.C.A. Penal Code, Sec. 6.03(a) and (b). Moreover, neither his motive nor his subsequent actions raise an issue that he acted recklessly or with criminal negligence. See V.T.C.A. Penal Code, Sec. 6.03(c) and (d). When we read appellant's confession together with the psychiatric and other defense testimony, we find no evidence that appellant acted in a reckless or criminally negligent manner. The trial court did not err in refusing the requested charges.

■ During his argument at the guilt-innocence stage of the trial, one of the prosecuting attorneys said:

"In your capacity as Jurors, Ladies and Gentlemen, you represent the community and you represent the citizens of this county. The verdict you return today will send a message through this community. Are you going to say that even though based on the evidence this Defendant intentionally beat this baby with her (sic) hands, a belt, and a rod till she was a mass of a bloody and bruised thing, that he didn't mean to kill her? Even though testimony was adduced that he worked in a hospital? Are you going to tell a potential child killer that if he knowingly time after time beat the child until the baby looked like this, that he didn't intend to kill that baby?

"MR. FOLSOM: We object to this as a call for law and order argument to potential killers, it doesn't apply to this case.

"THE COURT: Overrule the objection.

"MR. BARROSO: Are you going to say by your verdict today, Ladies and Gentlemen, that just because this Defendant has a Constitutional Right to plead insanity, that just because he might have been depressed, that he had a right to savagely and without mercy beat that little baby to death and snuff out Christine Montelongo's life? Ladies and Gentlemen, your decision here today will deliver a message to this community.

"MR. FOLSOM: Your Honor, this is a call for law enforcement, the Jury's not to concern themselves with what the community would think, they're to decide the guilt or innocence of this Defendant.

"THE COURT: Overrule the objection."

Appellant contends that this argument refers to the expectation or demand of the community that appellant be convicted. This contention does not comport with his objection at trial, and is without merit. The argument was a proper plea for law enforcement. See *Hicks v. State,* 545 S.W.2d 805 (Tex.Cr.App.1977).

■ Appellant's last five grounds of error relate to the following argument, also at the guilt-innocence stage, by the other prosecuting attorney:

"MR. MORRIS: You know, the human child is—and this is in the record—totally helpless and dependent creature, hasn't any way to defend itself except with the arms and legs, meager little attempts at

it. But if you will, and I'd appreciate it if you would, just join with me on a brief little mental excursion, and let's pretend one thing. Let's pretend that you're listening to a letter written to that four year old girl by someone who didn't know her, none of you knew her, I don't know her. And let's pretend this letter is written now, after she's dead. 'Dear Christine'—

"MR. FOLSOM: I'll object, this is outside the argument.

"MR. MORRIS: Your Honor, this is perfectly proper argument and I'm not alluding to this as facts.

"THE COURT: Well, I haven't heard anything yet which is objectionable. Overrule the objection.

"MR. MORRIS: All right. Let's go back. 'I'm writing you to let you know I care about you and your memory. I feel a deep, dark sorrow that lays heavily in my heart'—

"MR. FOLSOM: Your Honor, he's quoting from a letter that doesn't exist. Your Honor, he's going outside the record and we object to it.

"MR. MORRIS: Your Honor, it's a letter, I made it up.

"MR. FOLSOM: Well, Your Honor, what's in his heart is not admissible in this trial and there's no evidence to it and it's improper argument.

"THE COURT: All right. Let's have order in the Court.

"MR. FOLSOM: Excuse me.

"THE COURT: Overrule the objection.

"MR. MORRIS: Your Honor, how much time do I have?

"THE COURT: Until 3:37, twenty-seven minutes.

"MR. MORRIS: Twenty-seven minutes.

"Have you heard the expression, 'A scalded dog howls,' Do you know what that means? When a dog is hurt, it howls, doesn't it?

" 'I feel a deep, dark'—

"MR. FOLSOM: Your Honor, is that a comment on my objection?

"THE COURT: I think it is and I'll sustain your objection, Mr. Folsom, and admonish Counsel not to do that again and instruct the Jury to disregard his last remark.

"MR. MORRIS: 'I feel a deep, dark sorrow that lays heavily in my heart. My sorrow has a hard bitter taste, and causes a lump in my throat when I swallow. I saw your picture and you're a beautiful child'—

"MR. FOLSOM: Your Honor, again, I object, we're going into evidence of feelings of the Prosecutor and that's improper argument.

"THE COURT: Overrule the objection.

"MR. MORRIS: 'You're one of God's very own treasures. I would have loved to have teased and tickled you and cuddled you, and told you that maybe your beautiful brown eyes came from eating too many chocolates. Today was a beautiful day. The air felt as cool as ice cubes and fresh mint. I saw some children flying kites in the park and as I heard their little squeals of delight, my mind drifted back to you, and I felt so desolate knowing that you could never be there.'

"MR. FOLSOM: Your Honor, again, I have to object. This is going far outside the record.

"THE COURT: I'll sustain the objection to the last remark about the kites and instruct the Jury to disregard it.

"MR. MORRIS: 'So much in this world is for children, beach, carnivals, Disneyland, and best of all Christmas.'

"MR. FOLSOM: Your Honor, again, it's far outside the record, and I'll object to it.

"THE COURT: It's outside the record, but it's allegorical, I'll overrule the objection.

"MR. MORRIS: 'Christine, I hope that you had some lovely Christmases. Did your brown eyes light with excitement, did your chubby little hands clap with glee as you ripped open the presents? I can hear you now ask for the one hundredth time, "Did Santa really come." Christine, you'—

"MR. FOLSOM: Your Honor, this is outside the record and obviously making up facts that aren't even real.

"MR. MORRIS: Your Honor, I have admitted this is not in evidence. It's a letter written, not as proof of—

"THE COURT: Overrule the objection.

"MR. MORRIS: 'Christine, you embody the heart and soul of Christmas, you are warmth, excitement. Your lovely innocence's all there to share, to give so fully to some poor foolish adult like me. All it takes is one little whisper in my ear and one soft giggle and my answer is yes to your every request. Precious child, may your agony be healed ever so lovingly and may your little innocent spirit stay kindled and locked in my heart so that I may be everlastingly reminded of the need for more love in this world for little children.' "

Appellant contends that this argument injected facts outside the record, was an expression of the prosecutor's personal opinion, and was an effort to inflame the minds of the jurors. The State concedes that that argument was unique, but argues that the "imaginary letter was, in effect, no different from the argument given in many murder cases, that the deceased had a right to enjoy the rest of his or her life."

The argument of the prosecutor was maudlin and in poor taste, but did not inject any incriminating facts not in the record. Moreover, the prosecutor did not express his opinion as to appellant's guilt, nor did he seek to inflame the minds of the jurors with a lurid description of the crime or with disparaging references to appellant. The argument was in essence a plea for law enforcement cast in purple prose. Reversible error is not presented.

The judgment is affirmed.

1. The cases are *Brown v. State*, 475 S.W.2d 938 (Tex.Crim.App.1971); *Corbett v. State*, 493 S.W.2d 940 (Tex.Crim.App.1973), and *Tocher v. State*, 501 S.W.2d 921 (Tex.Crim.App.1973).

1. The Supreme Court had delineated the opinion of the Supreme Court of Arizona as follows:

TEAGUE, Judge, concurring.

For the reasons set forth in my dissent on the denial of appellant's motion for rehearing in *Pearson v. State*, 587 S.W.2d 393, 396 (Tex.Crim.App.1979), I would apply *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), retroactively. Thus I do not agree that the search in this case was lawful. The three cases relied upon by the majority to uphold the search in this case do not state the correct law and should be overruled.[1]

I concur in the result, however, because the improper admission in evidence of the fishing rod handle was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). There was ample evidence of appellant's guilt, and appellant confessed that he spanked his daughter Christine with a fishing rod.

Before the court en banc.

## ON MOTION FOR REHEARING

Appellant's motion for rehearing denied without written opinion.

CLINTON, J., dissenting, joined by MILLER, J.

TEAGUE, J., dissenting, joined by ODOM, CLINTON and MILLER, JJ.

CLINTON, Judge, dissenting.

Concurring in the respect indicated, Justice Rehnquist said in *Mincey v. Arizona*, 437 U.S. 385, 405–406, 98 S.Ct. 2408, 2420–2421, 57 L.Ed.2d 290 (1978):

" . . . [T]he State of Arizona *asks us to adopt* a separate 'murder scene' exception to the warrant requirement and the Court, for the reasons stated in its opinion, *correctly rejects this invitation.*"[1]

" . . . The Arizona Supreme Court *did not hold* that search of the petitioner's apartment fell within any of the exceptions to the warrant requirement previously recognized by this Court, but rather the search of a homicide scene *should be recognized* as an additional exception."

Thus, as a matter of authoritative Fourth Amendment law, there is not, and never has been, a "murder scene exception"[2] to the warrant requirement of the Fourth and Fourteenth Amendments.[3] Therefore, in the case at bar the majority opinion on original submission mistakenly stated "the emergency or exigency rule applicable to homicide scene investigation" was "*abolished* by the United States Supreme Court in *Mincey v. Arizona.*" The Supreme Court cannot abolish what it has never adopted.

Accordingly, there is nothing in *Mincey v. Arizona* that raises a question of its application—retroactively or prospectively. The Supreme Court merely decided Arizona had erred in undertaking to create *new* Fourth Amendment law.

I dissent.

MILLER, J., joins.

TEAGUE, Judge, dissenting.

Judge Odom of this Court in *Stearn v. State,* 487 S.W.2d 734 (Tex.Cr.App.1972), recently stated the following: "There seems to be a growing tendency by the prosecutors [of this State] to go outside the record in jury argument."

Today, however, in affirming this conviction, I believe that a majority of this Court puts its endorsement and approval upon an argument which was clearly outside the record.* The majority panel opinion derided it as "maudlin and in poor taste". It concerns a prosecuting attorney who, over objection, read to the jury a hypothetical letter addressed to the young deceased person. The appellant timely and properly objected to the argument, on the ground that it was

"outside the record." The trial court overruled appellant's objection. Because I find that the argument to be outside the record, extremely or manifestly improper, and highly prejudicial to the appellant, the appellant's conviction should be reversed and not affirmed. See *McKenzie v. State,* 617 S.W.2d 211 (Tex.Cr.App.1981) (Improper for prosecuting attorney in his argument to conjure up hypothetical witnesses). To the action of the majority in affirming this conviction, I must respectfully dissent.

This Court long ago, in *Pena v. State,* 137 Tex.Cr.R. 311, 129 S.W.2d 667, 669 (1939), advised the Bench and Bar of this State what the object and principal purpose of jury argument should be, and also stated that jury argument should not be used to arouse the passions of prejudices of the jury by matters not properly before them.

> "The object and principal purpose of an argument to the jury, as we understand it, is to aid and assist them in properly analyzing the evidence and arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence. Nor should resort be had in argument to arouse the passion or prejudice of the jury by matters not properly before them."

In *Andrews v. State,* 150 Tex.Cr.R. 95, 199 S.W.2d 510, 514 (1942), this Court also made the following statements:

> "The purpose and object of arguments are to discuss the evidence and to assist the jury in arriving at a proper conclusion of the case from all of the facts and circumstances proven. Improper implications or vilifications are not conducive to

---

*Mincey v. Arizona,* 437 U.S. at 390, 98 S.Ct. at 2412. (All emphasis is mine unless otherwise indicated.)

**2.** The "exception" was erroneously derived from a flawed extension of the doctrine summarized in *Wayne v. United States,* 115 U.S. App.D.C. 234, 241, 318 F.2d 205, 212 (opinion of Burger, J.): "The need to protect or preserve life or avoid serious bodily injury is justification for what would be otherwise illegal absent an exigency or emergency." Compare *Bray v. State,* 597 S.W.2d 763 (Tex.Cr.App.1980).

**3.** In *Mincey v. Arizona,* supra, 437 U.S. at 395, 98 S.Ct. at 2414, the Opinion of the Court makes unmistakenly clear its holding, *viz:*

> "In sum, we *hold* that the 'murder scene exception' *created* by the Arizona Supreme Court is inconsistent with the Fourth and Fourteenth Amendments—that the warrantless search of Mincey's apartment was not constitutionally permissible simply because a homicide had recently occurred there."

* The entire objectionable jury argument is set out on pages 714–716, inclusive, of the majority panel opinion.

the attainment of that object. We have time and again called attention of the prosecuting attorneys to the danger of departing from legitimate argument as it may result in great harm to the accused which will in such instance require a reversal of the case.

See also *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The "letter", which was not in evidence but which was submitted to the jury through the prosecutor's jury argument, did nothing "to aid and assist [the jury] in properly analyzing the evidence [presented to it]." *Pena v. State,* supra. I have concluded that the prosecutor's argument that was made, which was predicated upon the "letter", did nothing less than "arouse the passions [and] prejudices of the jury [with] matters not properly before them." Such personal comments as the "feelings" the "author" of the "letter" may have had toward the young deceased person, the "author's" personal belief that the deceased was a "beautiful child", that he believed her to be "one of God's very own treasures," and that "Today was a beautiful day", "The air felt as cool as ice cubes and fresh mint", and other such comments describing the young deceased person and the "author's" feelings for her, and his thoughts about the matter, were all outside the record and should not have been made.

The majority, by affirming this conviction, impliedly agrees with the State's claim that "the imaginary letter was, in effect, no different from the argument given in many murder cases, that the deceased had a right to enjoy the rest of his or her life." Not only do I disagree with that claim, but I find that this argument went beyond such a claim. By injecting into the case his personal, albeit hypothetical, "feelings" and descriptions about and toward the young deceased person, the prosecuting attorney put before the jury "facts" which were not supported by the record. The comments he made have no basis in fact. They could have only been intended to inflame the emotions, passions, and prejudices of the jury. Even though the prosecutor disclaimed during his argument an intent to present the "letter" as "fact", nevertheless, it is clear from reading the argument that the "letter" must have conveyed to the jury the impression that the "letter" embodied the prosecutor's own personal feelings and descriptions of the young deceased child, which are reflected by such statements as "You embody the heart and soul of Christmas, you are warmth, excitement. Your lovely innocence's all there to share." Such was clearly improper argument as it injected "facts" into the case, which "facts" were not in evidence before the jury. The argument should not have been made.

In *Moser v. State,* 91 Nev. 809, 544 P.2d 424 (1976), the Nevada Supreme Court not only condemned a "Merry Christmas" type argument, wherein the prosecuting attorney had argued the following:

"December 22, 1972, Merry Christmas, from Ed Moser [the defendant] to the Batiste family [the family of the deceased]... Wouldn't it be nice, as Mr. Bonaventure [defense counsel] says, if we could have Mr. Batiste [the deceased] back here? If emotion and a guilty conscience could only bring Roy Batiste back here, wouldn't it be nice? If sorrow could bring Roy Batiste back to his wife and six kids, wouldn't it be nice? You saw this Defendant testify up here yesterday. He was emotional, he broke up in places but let's look at it realistically. Do you think for one minute that this man is sorry for Roy Batiste? Do you think for one minute that man feels sorry for Roy Batiste and those six kids, or do you think this man feels sorry for himself because he committed a murder in cold blood?,

and held the following:

The comments made were improper. They were designed to inflame the emotions of the jury. They had no place in a trial, and counsel's objection should have been sustained... ,

but speaking through its Chief Justice, in his concurring opinion, stated the following:

Accordingly, in cases tried after this date, where the trial transcript discloses improper argument, I understand that this

court will consider referring the offending attorney to the local administrative committee for determination of an appropriate penalty. Where a retrial is necessitated, I suggest the penalty might properly include payment of court costs to the state, and an appropriate assessment to cover the cost of public or private defense counsel.

More than a century of admonitions has failed to engender in all who serve as prosecutors that instinct for propriety and fairness which their public duty obviously demands. Manifestly, another approach is indicated.

A proceeding designed to determine the guilt or innocence of an accused is not the proper forum to appeal to a jury's emotions. By inflaming the passions and emotions of the jury, through such argument as was made here, can only induce a jury to return a finding of guilt based on passions, emotions, and sympathy, and not on whether the accused is actually guilty of committing the criminal wrong for which he is on trial.

I believe that by affirming this conviction the majority has effectively emasculated the real and true purpose and meaning of jury argument, and after today the proverbial "skunk", see my dissenting opinion in *Carter v. State,* 614 S.W.2d 821 (Tex.Cr. App.1981), is now permitted to carry the day under the problematical heading of "a plea for law enforcement".

Prosecuting attorneys of this State should never forget what Judge Lattimore of this Court stated many years ago in *Vargas v. State,* 128 Tex.Cr.R. 139, 79 S.W.2d 860 (1935):

> The closing argument of the state is a powerful weapon in its hands. Men on the jury unused to court procedure, not quite sure what should be remembered as the case proceeds, hear their county [or district] attorney, most frequently, as in this case, a highly esteemed officer, in the closing moments of the argument, tell them what has been said, what the accused had admitted, and his statements are properly accorded weight.

Unfortunately, the majority of this Court forgets that not very long ago, in *McKenzie v. State,* supra, this Court, by unanimously denying the State's motion for rehearing, has ruled that a prosecutor's jury argument, which conjured up hypothetical witnesses, was reversible error even though an objection to the argument had been sustained. I am unable to understand how a conjured-up, emotionally laden letter, read to a jury by the prosecuting attorney at the guilt stage of the trial, can be any less injurious than conjuring up hypothetical witnesses, as was done in *McKenzie v. State,* supra; especially in this instance where the appellant's objection was overruled and there sustained.

Today's decision, I fear, will breed further improper jury arguments—all under the guise of pleas for law enforcement.

I, therefore, respectfully dissent.

ODOM, CLINTON and MILLER, JJ., join.