Lincoln **BONIER**, Jr., Appellant,

v.

The **STATE** of Texas, Appellee.

No. C14–86–228–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 3, 1987.

John F. Carrigan, Houston, for appellant.

John B. Holmes, Dist. Atty., J. Harvey Hudson, Asst. Dist. Atty., Houston, for appellee.

Before JUNELL, SEARS and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

Appellant Lincoln Bonier, Jr. was convicted by a jury of first degree murder and sentenced to thirty-five years confinement in the Texas Department of Corrections. Appellant asserts four points of error on appeal objecting to certain questions and jury arguments by the prosecutor. We affirm.

Appellant's first point of error attacks the trial court's denial of his motion for mistrial made during the guilt/innocence phase of the trial. Defense counsel called Lester Jones as a fact witness. The prosecutor began cross-examination of Mr. Jones by asking him if he had been drinking or was under the influence of any type of intoxicant or drug. The witness responded that he had not been drinking on the day of trial and that he never used drugs. Appellant's counsel objected and requested that the jury be instructed to disregard the questions. The court sustained the objection and granted the requested instruction. Appellant moved for a mistrial which the court denied.

The prosecutor's questions were not clearly calculated to inflame the minds of the jury nor were they of such a character that any negative impression could not be withdrawn from the minds of the jury. *Hooten v. State,* 689 S.W.2d 328, 329–30 (Tex.App.—Fort Worth 1985, no pet.); *Crawford v. State,* 603 S.W.2d 874, 876 (Tex.Crim.App.1980). Any error was cured by the court's instruction to disregard. *Thomas v. State,* 578 S.W.2d 691, 695 (Tex. Crim.App.1979). Appellant's first point of error is overruled.

Appellant contends in his second point of error that the trial court erred in overruling his objections to the prosecutor's use of "have you heard" questions during cross-examination. We disagree.

When a witness testifies on direct that appellant's reputation is good, the state may properly inquire whether the witness has heard hearsay, which is inconsistent with his opinion. *Brown v. State,* 477 S.W.2d 617, 619–620 (Tex.Crim.App.1972). Error occurs only when the form of the question implies the incident in fact took place. *Maxwell v. State,* 595 S.W.2d 126, 128 (Tex.Crim.App.1980); *Nerio v. State,* 672 S.W.2d 253, 255 (Tex.App.—Beaumont 1984, no pet.). Here the questions were in the proper form and did not assert that the incident referred to in the questions occurred. Appellant's second point of error is overruled.

In his third and fourth points of error, appellant attacks the jury argument of counsel for the state. He asserts that the trial court erred in overruling appellant's objections to the prosecutor's jury argument which concerns a fictitious letter-to-the-deceased argument and an alleged attack on defense counsel. We are unpersuaded by appellant's arguments.

During the final jury argument, the prosecutor couched a portion of his jury argument in the form of a ficticious letter that he might have written to the deceased after her death. Because of the nature of this argument, the portion regarding the imaginary letter will be repeated in its entirety. "MR. ANDERSON: I thought about what I would do if I was able to write a letter to Sandra Alley and tell her what happened.

What has happened here since we have been here, Ms. Alley.

"MR. HOWARD: Judge, I'm going to object to this as being highly prejudicial.

"THE COURT: Overruled.

"MR. ANDERSON: I think I would say Dear Sandra, we are in trial on your case now. I know that you can't be with us here to testify. I wish you could. I know what has happened to you and I am representing you and I hope I can do a good job.

"MR. HOWARD: Judge, he is out of the record, first of all.

"THE COURT: Overruled.

"MR. HOWARD: Secondly, he is trying to inflame the minds of the jurors and it's prejudicial.

"THE COURT: Overruled, Counsel, this is closing argument.

"MR. ANDERSON: Sandra, I presented the facts as best I could. I called the witnesses to this case. Obviously, you are our eyewitness and you can't be here. I had your sister, Wanda, come up, the one you were going to go out with that night. She testified that, yeah, you had used some bad words before, you maybe called somebody bald-headed and whatever else. She testified that y'all were going to go out that night. She heard you and Lincoln arguing. She couldn't hear what you were saying so she got up closer. She could see through a window here. We drew a diagram of your house. It showed the windows of the bedroom where you died. And she could see not very well, but she said she saw what she thought was some human legs, she thought they were Lincoln's. She heard the conversation more clearly as she leaned over the fence. I guess y'all were yelling pretty good. She heard you say go ahead and shoot me, Lincoln, if you are going to. Sandra, believe me, that was the wrong thing to say. Because he took you up on it. And then she heard you screaming and say, no, Lincoln, no.

"MR. HOWARD: Judge, may I have a running objection on this?

"THE COURT: Yes, sir.

"MR. ANDERSON: And then she heard the first shot. And I got her to count, Sandra, and she said the second shot was about four seconds later. And I don't know which one took your life, but one of them did.

"I then called a guy named Earl Winston and the Defense said that Earl is a liar and a cheat and a thief and a drunk and every other kind of thing, I don't know. I know that Earl is a friend of the defendant and Earl didn't want to be up here testifying and did because he made a statement to somebody who told the police and they finally tracked him down. And I thought Earl was real credible, Sandra, because he didn't have to say he was in jail. He didn't have to say anything. But he did. And I don't think he was looking for acceptance as Defense would have you believe. Sandra, I think he was just trying to tell the truth. And he told about something you probably know about. That your husband said he could kill somebody and get away with it and he knew a dude he could talk to and there wasn't no jury in the world that would give him any time. That he knew how to talk and make it look like self-defense. And you know, Sandra, it was funny because that was kind of consistent with the way the room was found. The sheets were off the bed and there was a knife laying there so everybody could see it. It looks like an attempt that Lincoln may have made to make it look like self-defense.

"Well, we called Mr. Bailey, your boss, and he told us about the fight you and Lincoln had that day and Lincoln telling you to get your butt home. Lincoln said it never happened. He said he was drinking with Mr. Bailey. But Mr. Bailey doesn't really have any reason to lie and if anybody is going to shut down his business, it's going to be all those people that the Defense called in here. There is a lot more of them than there are of us, Sandra.

"And L.C. Jones, when he was on the stand, said y'all would fight sometimes but, also, said that Lincoln asked you why y'all were fighting, who loaded this gun. How did this gun get loaded? And, Sandra, you said I don't know it must have been loaded

since New Year's Eve. You know, Sandra, that seemed pretty important to me. Because it sure did prove that Lincoln knew that was loaded when he pointed it at you. He had to know it was loaded and he had to know it was loaded before he shot you because you answered him. And L.C., he's Lincoln's friend, too. Lincoln called in a bunch of people who, apparently, he had met through the years and they said his reputation is good. Some of them didn't really know his reputation. In fact, most of them didn't. They sure didn't know anything about what happened there in that room that night. They knew you were dead but they probably didn't know you very well either. Nobody was here to talk about you.

"Dr. Bellas said you died because somebody shot you in the chest, said a shotgun is a firearm.

"Then Officer Goines got on the stand and Defense counsel says that you and him—or implied that you and he had something going. And that he got in there and changed the scene. Well, the jury can believe that or not. I hope they can see through what Mr. Bonier, your husband, is trying to do.

"And Defense counsel, also, said that the D.A.'s office wanted something special done on this case. That they wanted something special done and they were trying to dig up witnesses and they were trying to lie just like the eight other people. Well, Sandra, I am not lying. I don't have to lie. I wouldn't be in this business if I did. I can just bring 12 people the facts and hope that they are reasonable—

"MR. HOWARD: Judge, for him to insinuate that I have called him a liar or, whatever, I mean it's not true, it's improper and I object to it.

"THE COURT: Overruled.

"MR. ANDERSON: And, Sandra, all I can do is bring the testimony to these jurors and hope that they, as intelligent people, can see what the facts really are.

"MR. HOWARD: Judge, by innuendo conversely he is trying to say that I am lying to the jury or, whatever.

"THE COURT: Okay, I don't think that implication is being made, but I think the jury understands that you certainly didn't say any lies, Mr. Howard.

"MR. ANDERSON: I called Sergeant Burmester, Sandra, he said that he had talked to Lincoln right after the shooting. Lincoln told him, after he had told Officer Goines that he shot his wife, that he had shot you and killed you and said he didn't know the gun was loaded and the gun just went off. He told Sergeant Burmester that he pulled the trigger and then both barrels went off. He pulled the trigger. He knew the gun was loaded, Sandra, and he pulled the trigger. Those are statements out of his mouth. And now you are dead. You won't ever be alive again. And your husband said that he never—he was so concerned about you, he loved you so much that he didn't want to go into his son's room and use the phone to call an ambulance. He wanted to drive to the 7–Eleven. Sandra, I hope the jury sees that for what it is.

"And, Sandra, the physical evidence that we've presented, I think it corroborates straight down the line from what Earl said about the defendant's plan to what L.C. Jones said about you and him having an argument and him saying who loaded this gun.

"About Goines even saying that he found the room like it is. About Burmester saying that he told him he pulled the trigger. And about Goines, also, saying that he said, well, hey you know how it is, man, you know how it is.

"He said that you were all the way across the room and you started running full blast at him in one statement but you were found just a couple of feet from the nightstand. How could you have been running full blast? How could anybody know that you were running full speed if you turned from the nightstand and died a couple of feet away. Sandra, there was a bed between you and Lincoln and there was a chair and Lincoln, also, told Sergeant Burmester that he got the shotgun out of the closet. But he told the jurors that it was leaning up against the wall. And he said

that you had this look on your face he had never seen. And he said that he didn't have the opportunity to run out the door. And you know self-defense says if you can retreat you have got to. Self-defense says you have got to genuinely be scared and apprehensive of death. And self-defense says if the jurors can take into account any other arguments that have ever been had in their resolution. And what that is said about you, Sandra. It, also, says a jury can take into account the fact that you have been beaten up by him before. That you have had your eye blacked to where you had to wear black glasses at work. And you have been scratched up before by him. And that, by God, if anybody ever had a reason to pull a knife, if that actually happened, then you did to keep him off of you. And he shot you real good, Sandra. He accidently shot you real good because they pulled pellets out of your heart. And they pulled a wadding from a shotgun blast out of your heart.

"MR. HOWARD: Judge, you say I do have a running objection on this inflammatory argument?

"THE COURT: Yes, Counsel.

"MR. ANDERSON: And that telephone worked in that house and you didn't deserve to die like you did, Sandra. You didn't deserve it. It should never have happened and now 12 people are going to go back and see whether it was okay—

"MR. HOWARD: I would have to renew my objection.

"THE COURT: Overruled.

"MR. ANDERSON: —for Lincoln to shoot you in the heart and come and tell them, well, I didn't do it intentionally or if I did, it was self-defense.

"And now, Sandra, its going to be up to them to decide and, Sandra, I got faith in them. I think they are reasonable people and I think they know what really happened and I think they are going to apply the facts of the law and not be mislead by any type of flowery argument or any type of screaming or yelling. They are going to base their decision on the facts. And they are going to come back with a verdict that they are going to be proud of. Thank you very much."

In order to be permissible, the jury argument must fall within one of four areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) response to argument by opposing counsel; and (4) pleas for law enforcement. *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex.Crim.App.1973). After reviewing the prosecutor's argument, we find that the argument essentially falls within the first and second areas of proper argument—a summation of the evidence and reasonable deductions therefrom. Although this particular form of jury argument is not generally looked on with favor because it can be easily abused, the Court of Criminal Appeals has approved arguments given in this form when its use falls within one of the proper areas of argument. *Montelongo v. State*, 644 S.W.2d 710, 716 (Tex.Crim.App. 1980). It is necessary that such an argument be carefully examined to insure that it stays within the areas of permissible argument. Here, the prosecutor did not inject any prejudicial or incriminating facts not in the record that would mandate a reversal. Furthermore, the prosecutor did not express his opinion as to appellant's guilt, nor attempt to inflame the minds of the jurors with disparaging references to appellant or lurid descriptions of the crime. The prosecutor's reference to the removal of the shotgun-blast wadding from the decedent's heart does not, in our opinion, constitute a prejudicial, lurid description. It is merely a summation of the testimony given by the medical witness, Dr. Bellas.

We find that the form of the argument is not per se reversible error and that it is grounded on a proper summation of the evidence and reasonable deduction to be drawn therefrom. Further, we find that the jury is quite capable of dealing with an argument in this form if it is properly limited. We do not make an automatic inductive leap to the conclusion that the mere form of the argument rendered the jury incapable of fairly sifting through the evidence presented.

Appellant also complains that the prosecutor improperly attacked his defense counsel during closing argument. During the argument, the prosecutor said, "I think you will see he has got a hard job. He has got to try to get this man off for murder when the facts show that he did commit murder." We do not find that this comment constitutes an attack on the defense counsel. The prosecutor did not imply that defense counsel acted improperly or inappropriately, only that his adversary's job was difficult because of the facts in the record. *See Shipp v. State*, 482 S.W.2d 870, 871 (Tex.Crim.App.1972). Appellant's third and fourth points of error are overruled.

The judgment is affirmed.

SEARS, Justice, dissenting.

I respectfully dissent.

The entire argument of the prosecutor, although *at times* dealing solely with the evidence and within the record, was obviously conceived and delivered for the sole purpose of inflaming the minds of the jury and creating such an atmosphere of sympathy for the deceased and prejudice against Appellant that it totally precluded even the possibility of a fair trial.

The State responds to Appellant's third and fourth points of error by labeling this argument merely "an imaginative form of argument to aid and assist the jury in properly analyzing the evidence before it." The State asserts that the argument did not inject facts outside the record nor was it an attempt to inflame or prejudice the jury. I do not agree. There is no doubt that Appellant's objections, based on "prejudicial argument," "inflaming the minds of the jurors" and the argument's being "outside the record" were proper and should have been sustained. I cannot say it was harmless beyond a reasonable doubt.

At one point in the trial the prosecutor was called to the stand by the defense, and while outside the presence of the jury, he testified that his investigation of the case revealed that Appellant had previously beaten up his wife, that he once had blackened her eye, and that she had previously been "scratched up" by him. However, the only evidence presented to the jury of these prior acts of violence was the hearsay testimony of the wife's employer that she once came to work with a black eye and claimed her husband gave it to her. The prosecutor was totally outside the record when he argued that the jury could "take into the account the fact that *you* had been beaten up by him before" and that *"you* have been scratched up before by him." The prosecutor then injected his own personal opinion that "if anybody ever had a reason to pull a knife ... then *you* did to keep him off of you." The prosecutor made other references to his personal opinion such as, "you didn't deserve to die like you did Sandra. You didn't deserve it." Further, while intimating the defense was lying, the prosecutor said, "Well, Sandra, I am not lying. I don't have to lie. I wouldn't be in this business if I did."

Comments by the prosecutor concerning his personal opinion, as well as his argument outside the record, are impermissible and are reversible error. *McKenzie v. State*, 617 S.W.2d 211, 221 (Tex.Crim.App. 1981). The prosecutor also inflamed the minds of the jurors by lurid descriptions of the offense, such as "they pulled a wadding from a shotgun blast out of *your* heart." Such argument is reversible error. *Montelongo v. State*, 644 S.W.2d 710, 716 (Tex.Crim.App.1980). In *Montelongo*, the Court of Criminal Appeals affirmed the conviction, but only after finding that the prosecutor's argument *did not* "inject new facts not in the record ...," "express his opinion ..." or "inflame the minds of the jurors with a lurid description of the crime or with disparaging references to appellant."

This court has previously condemned "imaginary" Christmas cards quoted by the State in closing argument as being outside the record and for the improper purpose of inflaming and prejudicing the jury. *Washington v. State*, 668 S.W.2d 715 (Tex.App. —Houston [14th Dist.] 1983, pet. ref'd). I do not believe there is any place in our system of criminal jurisprudence for imaginary letters, phone calls or Christmas cards

because they serve no *legitimate* function in the summation of a criminal trial. A proper jury argument is one that summarizes the *evidence*, draws *reasonable* deductions from the evidence, responds to argument of opposing counsel and makes a *proper* plea for law enforcement. *Todd v. State*, 598 S.W.2d 286, 296 (Tex.Crim.App. 1980).

When the jury argument as a whole is manifestly improper, injects new facts that are outside the record and are potentially harmful and prejudicial to the accused, includes the personal opinions of the prosecutor and is calculated to inflame the jury, then the argument is outside the bounds of permissible jury argument and creates an atmosphere that deprives the accused of his right to a fair trial. *See McKenzie v. State*, 617 S.W.2d at 221 and *Todd v. State*, 598 S.W.2d at 297. Point of error three should be sustained and the judgment of the trial court should be reversed and the cause remanded for a new trial.